IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

EDWARD A. MATTHEWS,

      Plaintiff,

   v.

DAVID J. MAHONEY,

      Defendant.

OPINION AND ORDER

Case No.  19-cv-991-wmc

Plaintiff Edward Matthews is proceeding in this lawsuit against former Dane County Sheriff David Mahoney, claiming that during his confinement at the Dane County Jail between September 5, 2017, and December 4, 2019, he was exposed to lead in the drinking water and denied recreation time, in violation of his constitutional rights . Now before the court is defendant Mahoney's motion for summary judgment (dkt. #47), as well as plaintiff Matthews' motion to strike (dkt. #60).

The court will grant in part and deny in part the to strike Matthews' motion to strike from the record as irrelevant and prejudicial defendant's Exhibits 1 and 5.  While Mahoney does not object to removing pages 13-21 from Exhibit 1, he contends that the balance of that exhibit is relevant to show Matthews' incarceration status.  Because his status is relevant to the applicable constitutional standard, the court declines to strike that portion of the exhibit.  Instead, the court will accept Mahoney's corrected Exhibit 1 (dkt. #62-1) and strike the original Exhibit 1 filed at dkt. #54-1.  As for Exhibit 5, Mahoney agrees to withdraw it for summary judgment purposes, so the court will grant that portion of Matthews' motion.

As for Mahoney's motion for summary judgment, the evidence of record does not support a finding that Matthews was subjected to dangerous lead levels in the drinking water, nor that Matthews was unable to engage in recreational activities for any extended period while confined at the jail.  Therefore, the court will grant defendant's motion for summary judgment and direct the entry of final judgment in his favor.

UNDISPUTED FACTS[1]

A. **Dane County Jail Conditions and Water Quality**

The water quality at the Dane County Jail has already been the subject of substantial litigation. The jail consists of three facilities:  part of the City-County Building ("CCB"); the William H. Ferris, Jr. Center ("FC"); and the Public Safety Building ("PSB").  The CCB was constructed in the mid-1950's.  It consists of a maximum-security facility with 341 beds located on the sixth and seventh floors of the CCB.  Each cell block houses four to eight inmates and is comprised of individual cells surrounding a day room or common room.   The FC is a minimum-security facility that houses inmates with work release privileges.  The PSB is currently designated as a medium/minimum security facility.

The Dane County Jail uses Public Health – Madison/Dane County to conduct lead testing in its water supply.  Relevant to plaintiff, whose stay at the jail began in September of 2017, as part of an effort to update the jail, a consultant team released a preliminary

---

[1]  Unless otherwise indicated, the following facts are material and undisputed.  The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.  While plaintiff purports to object to many of defendant's proposed findings of fact as overbroad, he fails to offer conflicting evidence or authority, so the court will summarily overrule those general objections where the basis is not obvious.

report on May 17, 2016.  The report indicated a possibility of lead in the jail's drinking water due to the age of the facility.  Also, in June 2016, Dane County received an inquiry from Flint, Michigan about how it had mitigated water quality concerns in the early 2000s, also prompting Dane County Director of Facilities, Greg Brockmeyer, to investigate the water quality at the jail.

On July 29, 2016, 20 samples of water were taken randomly from cellblocks in the oldest facility, the CCB.  The tests were taken primarily from cells that had been vacant for a period of time.  On August 16, the jail was notified that three of the twenty random samples were "slightly elevated" above the 15 $\mu$g/L level recommended by the EPA.

As a result, in August 2016, Dane County decided to test all consumable water sources at the jail for lead.  The County also decided to install water filtration systems across the entire cold-water supply for the CCB.  On August 19, while awaiting the installation of the water filtration systems, signs were also posted at the jail stating the following:

> While we are exploring options for the replacement of the City-County Building Jail, many systems are being tested.  In addition, we have received concerns from inmates.  As we test these systems, we ask for your patience.
>
> In the next couple of weeks, we will be collecting water samples overnight.  Public Health recommends that the water be run for 1-2 minutes or until it gets cold prior to drinking.  They recommend that you do not use hot water for consumption.

(Brockmeyer Aff. (dkt. #48) ¶ 13.)[2]  Defendant explains that because the water at the jail runs through copper pipes that may contain lead joints, the instruction to run the water

_____

[2] Matthews disputes that the signs were posted, but he cites evidence that stickers repeating the

3

for a few minutes was intended to mitigate the risk that lead would have dissolved in standing water.  The sign directed individuals not to drink the hot water because the initial plans were to only install filtration systems for cold water, but the jail later decided to install filtration systems for both hot and cold water.

From August to October 11, 2016, all consumable water sources at the jail were tested for lead.  Those results showed that less than 5% of the cells in the jail tested for lead levels slightly above the EPA recommendation.  Matthews disputes that all consumable water sources were tested because defendant's exhibits show that on September 28, 2016, only 14 cells were tested.  (*See* Exs. 2, 3 (dkt. ##48-2, 48-3).) However, Matthews is summarizing a portion of testing reports, and it is undisputed that on October 17, 2016, Public Health Madison and Dane County concluded that "[t]he Dane County Facilities Management personnel collected a total of 701 water samples . . . from the Dane County Jail between August 21 and September 28, 2016."  (Ex. 1 (dkt. #48-1).)

In October 2016, the County also decided to implement a policy to:  (1) affix stickers above all water fountains, reminding inmates to allow the water to run for two minutes before drinking; (2) install filters on fountains that tested with higher levels of lead; and (3) replace fixtures and piping throughout the jail to mitigate potential sources of lead.  In November 2016, Hooper Plumbing also began installing water filtration systems through the jail, including both hot and cold-water supplies.  Finally, on December 8, 2016,

---

statements were not ordered until December 2016.  (*See id.*, ¶ 19.)  Regardless, the stickers posted in December 2016 were different than those posted in August 2016, so this fact is undisputed.

stickers were affixed to fountains that advised inmates to run water for two minutes prior to consumption.

Since installing the water filtration systems, the water has also been tested quarterly or bi-annually, and it has never shown lead levels above the recommended 15 $\mu$g/L level. Although there has been no question about the safety of the water supply since that time, some of the signs posted throughout the jail instructing inmates to run water before consumption have remained posted.  Between September 2017 and December 2019, testing of the drinking water supply at the jail revealed no results above the recommended safe level of 15 $\mu$g/L.

**B. Matthews' confinement at the jail and issues with drinking water**

While an inmate at the jail, Matthews alleges that there was lead in the water supply throughout the jail, although he admitted in his deposition that he has no expertise or formal education in lead levels or water quality.  Matthews has not otherwise submitted evidence that he or anyone on his behalf has tested the lead levels at the jail.

Until July of 2018, Matthews did not file a grievance related to the water quality at the jail.  In response, jail staff informed him the details of the jail's lead mitigation efforts and advised him to continue running the water for 1-2 minutes or until it got hot before drinking it.  Matthews received similar responses to his subsequent grievances complaining about water quality.  During his time at the jail, Matthews also could have purchased bottled water through the commissary, but he did not.

Matthews has never been diagnosed with any illness or injury related to lead poisoning or elevated lead levels in his blood.  While Matthews claims that jail staff refused

5

to test his blood for lead, he does not dispute this fact or submit evidence that after he left the jail he was ever tested for lead exposure.

### C. Recreational opportunities at the jail

At the jail, inmates have access to active recreational activities such as basketball, exercise bikes, aerobic steps, as well as passive recreational activities such as television, newspaper, cards, games and puzzles.  When available, inmates are offered at least one hour of daily exercise and recreation, either outside of their cell or outdoors.  The CCB has two facilities specifically designed for recreation.  The indoor recreation room is 18' x 25'4 and includes two stationary bikes, floor mats, individual steps and pull-up and push-up bars.  The outdoor recreation area is 42' 4" x 29'.  It is located on the roof, and it contains a basketball court.  The use of the two recreational facilities is generally limited to inmates in general population housing, who are allowed access to the facilities in one-hour increments.

The CCB recreation deputy schedules recreational activities for inmates on a rotating basis.  Recreational activities are scheduled and rotated by cellblock, with only one cellblock able to access the facilities at a time. [3]  However, in 2017, 2018 and 2019, the CCB had an average inmate population of approximately 260 to 290 inmates at any time with only one recreation deputy was assigned to the CCB, and that deputy also had other responsibilities in addition to scheduling recreation facility time.

---

[3] If an inmate is transferred into a cellblock shortly after that cellblock is given time in a facility, that inmate must wait until the next rotation for access to that facility.

Although recreation facilities are limited, inmates also have daily access to recreational activities in the dayrooms of the cellblocks.  In the cellblocks, inmates can socialize, play games, read, watch television, use tablets and exercise.  Dayroom sizes at the jail vary.  A typical general population dayroom is 27'10" x 13'11"; a typical medical block cellblock has a dayroom that is 25'11" x 12'4"; and a typical segregation block has a dayroom that is 33'8" x 10'4".  Inmates in general population and medical blocks are allowed access to the dayroom from 4:45 a.m. until 2:00 p.m., and from 4:00 p.m. until 10:30 p.m.  Inmates in a medical block may be allowed additional dayroom time if they are medically cleared to do so.  Inmates in segregation or subject to lockdown for discipline generally are not allowed access to the recreation facilities, but those inmates are given access to a dayroom in one-hour increments.

**D. Matthews' confinement at the jail**

Matthews was confined at the jail beginning in September of 2017, having been charged with multiple crimes.  On May 23, 2019, Matthews pleaded guilty in two of the criminal charges  he was facing, and on November 1, 2019, Matthews was sentenced.

During his confinement at the jail from September 8, 2017, until December 18, 2019, Matthews was transferred between cells and locations often for various reasons, including discipline.  Still, the majority of his assignments were to the CCB, with some very short assignments in the PSB.

Between September and December of 2017 in particular, Matthews moved between segregation, a medical block, administrative confinement, and another institution.  In 2018, Matthews spent over six months in general population.  Otherwise he was housed

7

in: a medical block for about four months; segregation for about a week; and lockdown for a three-day period. In 2019, Matthews spent all but ten days in general population, with the remaining ten days Matthews spent in lockdown. On December 28, 2019, following his sentencing, he was transferred to another correctional institution.

Matthews conceded during his deposition in this case that he received time in recreation facilities, both outside and indoor, but maintains that he did not receive *sufficient* time. More specifically, Matthews claims that he accessed either the indoor recreation facility or the outdoor facility only nine times during his incarceration. Still, Matthews also conceded that he was allowed to access the dayroom of his cellblock for recreational activities all day, and that when he was in the dayroom, he could socialize, play chess, checkers and cards. He also acknowledged that inmates were allowed to watch television and use jail-provided tablets. Although more limited, Matthews similarly conceded that there was room in the dayrooms to perform exercises like push-ups, sit-ups, running in place or walking around the room. Finally, Matthews acknowledged that he could do jumping jacks in his cell.

Still, Matthews filed several grievances complaining about his access to recreation facilities, albeit not until June of 2018. Although Matthews was told that he could exercise in the dayroom, he did not want to wear a blue uniform while exercising, even though inmates were allowed to request additional blue uniforms if theirs became soiled.

Matthews filed another grievance in August 2018, stating that he had not visited recreation facilities in 14 weeks. However, Matthews stated in his deposition that he was unsure whether that 14-week time period was accurate. Matthews also conceded that

during that same time period, he could still access the dayroom, where he could engage in exercise and activities.

Matthews filed yet another grievance about the lack of recreational opportunities in January 2019, complaining that he had not attended a recreation facility in six months. In response, Matthews was advised that the jail inspector determined that dayrooms were adequate for physical activity. Six months later Matthews complained that he had only used the recreation facilities seven time in the prior 23 months, four times outside and three times inside.[4]

Matthews filed his next grievance on September 10, 2019, complaining that it had been 74 days since he visited a recreation facility. Staff responded that staffing needs and jail limitations impacted access to recreation facilities, and that Matthews still had access to the dayroom during that time frame. On October 10, Matthews filed another grievance stating that he last used the recreational facility on July 24, 2019, and he filed yet another grievance on October 26. Matthews appealed the resolution of that grievance, and a staff member responded that jail staff attempt to provide recreational opportunities, but access was limited by space and staffing. The response also indicated that he could engage in recreation any time he is outside his cell, including walking around and exercising within his cellblock. Matthews continued to file grievances, although he went to a recreational facility on November 18.

Finally, Matthews represents that he was diagnosed with a number of illnesses while confined at the jail, including fatty liver, high cholesterol, prehypertensive and high blood

---

[4] Matthews also agrees that he accessed a recreation facility on May 5, 2019.

pressure, although he also testified in his deposition that no medical professional told him that limitations on his access to the recreation facilities contributed to or caused those conditions. Matthews has not sought out treatment for any of the illnesses he attributes to a lack of recreation time. Similarly, Matthews claims to have suffered from mental health disorders, but no medical professional has told him that his mental health issues were caused by the recreational limitations at the jail.

### E. Matthews' interactions with Mahoney

Matthews has never met former Sheriff Mahoney, much less spoken with Mahoney about his concerns about the water or recreation time. Matthews does not know whether Mahoney ever learned about his particular complaints about the use of recreation facilities.

### OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Defendant seeks summary judgment on the merits of both of plaintiff's constitutional claims.

Because plaintiff was a pretrial detainee *and* convicted prisoner at different times during his 2017 to 2019 confinement at the Dane County Jail, two constitutional

standards are arguably applicable here.  Claims brought by pretrial detainees are governed by the due process clause of the Fourteenth Amendment, *Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015), while claims by sentenced prisoners are governed by the cruel and unusual punishment clause of the Eighth Amendment, *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994).  Since plaintiff's status changed once he was sentenced in 2019, the court will consider his claims under both standards.

The Eighth Amendment's prohibition against cruel and unusual punishment imposes upon prison officials the duty to provide prisoners "humane conditions of confinement." *Farmer*, 511 U.S. at 832.  To constitute cruel and unusual punishment, conditions of confinement must be extreme. *Id.*  To demonstrate that prison conditions violate the Eighth Amendment, therefore, a plaintiff must present evidence that satisfy a test involving both an objective and subjective component. *Lunsford v. Bennett,* 17 F.3d 1574, 1579 (7th Cir. 1994).  The objective analysis focuses on whether prison conditions were sufficiently serious, so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," *Farmer,* 511 U.S. at 834, or "exceeded contemporary bounds of decency of a mature, civilized society," *Lunsford,* 17 F.3d at 1579.  The subjective component requires proof that prison officials acted wantonly and with deliberate indifference to a risk of serious harm to plaintiff. *Id.*

Under the Fourteenth Amendment, a plaintiff must similarly show that "the severity and the duration of the conditions experienced were so significant . . . that they violated the Constitution." *Hardeman v. Curran*, 933 F.3d 816, 824 (7th Cir. 2019).  Under that test, a plaintiff must demonstrate that "(1) the conditions in question are or were

objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Id.* at 827 (Sykes, J., concurring).

While defendant seeks summary judgment on a number of grounds, the court need not reach all of them. Instead, the court takes up whether the conditions as to water quality and access to recreational opportunities were objectively serious enough to implicate his federal constitutional right, and Mahoney's knowledge of Matthews' exposure to those conditions.

## I.  Water Quality

Here, the evidence of record does not support a finding in plaintiff's favor with respect to the objective element of his claim regarding a lack of water quality within the Dane County Jail. There is no dispute that testing in 2016 demonstrated *some* of the water sources (less than 5%) had lead present at levels slightly above the EPA recommendations. Even at *that* time, however, the jail posted warnings to its inmates (1) informing them of this risk of lead exposure and (2) encouraging them to take steps to protect themselves by running cold water for a couple of minutes before drinking and by avoiding drinking hot water altogether. Moreover, these steps were intended to ameliorate risks of lead exposure in the *short term*, while the jail took steps to improve its filtration systems in the long term. There is no dispute that subsequent testing showed those additional steps have worked, with all water sources testing below the EPA recommendations after 2016, which predated

12

plaintiff's confinement in the jail.  That water fountain signs were still present encouraging running cold water for two minutes when plaintiff was later confined in the jail is *not* evidence that further testing showed elevated lead levels in the water; rather, it is undisputed that jail staff simply had not removed them.  Regardless, this "belt and suspenders" fix does not amount to a constitutional violation.

Although plaintiff believes that certain of his health conditions were caused by his consumption of lead-contaminated water during his time in the Dane County Jail, *no* evidence supports a finding that he was even exposed to unreasonable amounts of lead in the water during his confinement at the jail, much less that any exposure caused his symptoms.  As a result, a jury would have to speculate to find that he was exposed to lead poisoning in the jail's drinking water.  Indeed, given the undisputed facts of record demonstrate that there was no risk of exposure to a dangerous level of lead by 2017 when plaintiff's confinement began, a reasonable jury could only conclude the opposite.

Finally, even assuming that plaintiff had come forward with evidence sufficient to create a question of fact as to the safety of the drinking water at the jail between 2017 and 2019, plaintiff has similarly failed to prove that then Sheriff Mahoney was aware of the risk of continued presence of lead in any of the water sources or failed to undertake reasonable steps to mitigate that risk to plaintiff.  Therefore, Mahoney is entitled to summary judgment as to plaintiff's constitutional challenge to the safety of the drinking water at the jail.

## II.    Access to Recreation

The Court of Appeals for the Seventh Circuit has recognized that exercise is "a necessary requirement for physical and mental well-being," and it has held that depriving prisoners of "out-of-cell exercise opportunities" may violate the Eighth Amendment.  *See Delaney v. DeTella,* 256 F.3d 679, 684 (7th Cir. 2001) (prisoner denied all out-of-cell exercise opportunities for 6 months during a lockdown stated an Eighth Amendment claim); *see also Pyles v. Spiller,* 708 F. App'x 279 (7th Cir. 2017) ("A deprivation of exercise that prison officials expect will likely result in severe health problems may violate the Eighth Amendment, unless the deprivation is proportionate to a legitimate penological purpose.") (citations omitted).  However, the Seventh Circuit has also held that "short-term denials of exercise" do not violate the constitution.  *Thomas v. Ramos*, 130 F.3d 754, 764 (7th Cir. 1997) (denial of outdoor exercise for 70 days permissible); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (denial of out-of-cell exercise for 28 days permissible); *but see Antonelli v. Sheahan,* 81 F.3d 1422, (7th Cir. 1996) (concluding that prisoner who was denied recreation time for up to seven weeks, and then was afforded only one hour of recreation time every two weeks, stated an Eighth Amendment claim).  Critical here, there is no dispute that the jail afforded alternative forms of out-of-cell time that offered jail inmates the opportunity for exercise and mitigated a lack of access to outdoor recreation areas.  *Delaney*, 256 F.3d at 684 (citing *Harris*, 839 F.2d at 1236; *Shelby Cnty. Jail Inmates v. Westlake*, 798 F.2d 1085, 1089 (7th Cir. 1986)).

On this record, therefore, no reasonable jury could find that plaintiff's access to recreational activities and facilities were so limited as to present an objectively serious

condition, much less amounted to cruel and unusual punishment.  To start, there is no dispute that plaintiff had consistent, reliable access to the dayrooms for the vast majority of his confinement at the jail.  Indeed, for much of his time at the jail, plaintiff concedes that he had access to the dayroom for up to 15.5 hours a day.  Moreover, there is no dispute that dayrooms were not very different in size than the jail's recreation facilities, and plaintiff further agrees that the dayrooms were big enough for him to walk around the perimeter or perform stationary exercises, like push-ups or sit-ups.  In fairness, plaintiff commented that he could only engage in these activities if there was room, but he did not suggest it was not possible.  Finally, no evidence indicates that plaintiff attempted to exercise in the dayroom or within his cellblock, and he was prevented from doing so by other inmates or jail staff.

Plaintiff recognizes as much, focusing his claim on his more limited ability to access the specially designated recreation facilities.  Even the precise number of times plaintiff accessed a recreation facility is not clear from the record, since he could not remember the number of times that he used the recreation facilities between September 2017 and the summer of 2018, when he started filing grievances.  Moreover, during that time period, plaintiff acknowledges that he moved between a medical block, segregation or administrative confinement, all of which offered varied out-of-cell exercise.  In addition, plaintiff was located at a different institution during part of this time, during which any denial of access to recreation facilities was out of both the jail's, and more specifically, Mahoney's control.  Finally, even when his placement in more restricted settings occurred, it did not eliminate the possibility of exercise or recreation.  Rather, plaintiff was in the

medical block for about five of those months (*see* Ex. 2 (dkt. #54-2)), meaning that he would have had access to the medical block's dayroom, where he admits there was sufficient space to engage in certain types of exercise.

During the summer of 2018, and approximately over the course of the following year and a half, plaintiff says that he likely used the jail's designated indoor or outdoor recreation facilities at least nine times. While that constitutes very little access to a dedicated recreation facility, neither the Eighth nor Fourteenth Amendment requires jail officials to ensure access to a specially designated facility for exercise or with exercise equipment. As importantly for liability purposes, plaintiff needed to come forward with some evidence that then-Sheriff Mahoney was personally aware the jail was denying plaintiff adequate opportunities for exercise, and that he responded unreasonably or with a conscious disregard of plaintiff's need for exercise. Since no evidence suggests that he was ever aware of plaintiff's general conditions of confinement during his stay at the jail, much less his numerous complaints about his lack of access to the recreation facilities, Mahoney is entitled to summary judgment on plaintiff's constitutional challenge to his ability to engage in recreational activities. Accordingly, the court will grant Mahoney's motion in full and enter judgment in his favor.

## ORDER

IT IS ORDERED that:

1) Defendant David J. Mahoney's motion for summary judgment (dkt. #47) is GRANTED.

2) Plaintiff Edward Matthews' motion to strike (dkt. #60) is GRANTED in part and DENIED in part as set forth above.

3) Defendant's motion for extension (dkt. #70) is DENIED as moot.

4) The clerk of court is directed to enter final judgment in defendant's favor and close this case.

Dated this 8th day of February, 2023.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

17